UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

ORLANDO DIVISION

CASE NO. 22-cv-1603

MARIA LOURDES ORTIZ and HAROLD WILLIAM DOLPH, as Personal Representatives and Co-Administrators of the Estate of ALEXANDER OVIDIO BELLO ORTIZ and in their individual capacity,

    Plaintiffs,

v.

JOHN BURLEIN, JOSEPH BURLEIN, GREGORY LYNN TRAX, BRENDEN TYLER RUBIO, HENRY LAX, and ROBERT KRAMER,

    Defendants.

## COMPLAINT

Plaintiffs, MARIA LOURDES ORTIZ and HAROLD WILLIAM DOLPH, as Personal Representatives and Co-Administrators of the Estate of ALEXANDER OVIDIO BELLO ORTIZ, and MARIA LOURDES ORTIZ and HAROLD WILLIAM DOLPH as individuals, through undersigned counsel, sue Defendants, JOHN BURLEIN, JOSEPH BURLEIN, GREGORY LYNN TRAX, BRENDEN TYLER RUBIO, HENRY LAX, and ROBERT KRAMER, individually, and allege:

### PRELIMINARY STATEMENT

1. On September 6th, 2020, Cadet Alexander Ovidio Bello Ortiz ("Alex" or "Ortiz") was found shot in his bedroom.

2. At the time of the shooting, only two people were in the home: Alex, and his roommate, Defendant John Burlein ("John" or "Burlein").

3. Immediately after the shooting, John did not call 911.

4. Instead, John called his father, Joseph Burlein ("Joseph" or "Burlein Sr."), a retired Air Force Captain.

5. On the phone, moments after it occurred, John admitted to his father that he shot Alex.

6. Burlein Sr. directed John to reposition the gun and tell an accompanying story to make Alex's shooting look like a suicide.

7. More than **five minutes** after shooting Alex, John finally called 911 to falsely report that Alex had allegedly "collapsed" at home while Alex was alone in his room.

8. This would be the first of John's many lies.

9. Burlein Sr. gained access to the scene and persuaded police that it was not necessary to collect critical evidence and later destroyed any trace of his son's crime by bleaching it away.

10. To this day, John Burlein has not been arrested or prosecuted for admittedly murdering Alexander Bello Ortiz.

11. Nor has anyone been brought to justice for their role in the coverup or conspiracy.

12. Alex's grieving mother Lourdes Ortiz – while living an unimaginable nightmare – brings this action for Alex's wrongful death caused by the Burleins and other Defendants who conspired to commit, cover up, and connive in the murder of Alexander Bello Ortiz.

## PERSONAL REPRESENTATIVE

13. At all times material, the decedent, Alexander Bello Ortiz, was a citizen and a Virginia domiciliary.

COFFEY | BURLINGTON
2601 South Bayshore Drive, Penthouse, Miami, FL 33133 · T. 305·858·2900  F. 305·858·5261

14. Alex died on September 7, 2020, from a gunshot wound suffered the day before.

15. The Plaintiffs, Maria Lourdes Ortiz and Harold William Dolph, at all times material, were and are the duly appointed, by a Virginia probate judge on August 24, 2022, Personal Representatives and Co-Administrators of the Estate of Alexander Ovidio Bello Ortiz.

16. Plaintiffs bring this lawsuit on behalf of Alex's Estate and all statutory survivors under the Florida Wrongful Death Act.

17. Maria Lourdes Ortiz and Harold William Dolph, are Alex's surviving parents and are potential beneficiaries entitled to recover for Alex's wrongful death in accordance with Florida's Wrongful Death Act.

## PARTIES AND CITIZENSHIP

18. Plaintiffs, as the legal representatives of Alexander Bello Ortiz's Estate, are deemed to be citizens of the decedent's home state, Virginia.

19. Defendant John Nicholas Burlein is a 22-year-old male citizen domiciled in Florida.

20. Defendant Joseph John Burlein is a 56-year-old male citizen domiciled in Florida.

21. Defendant Henry Joseph Lax is a 27-year-old male citizen domiciled in Florida.

22. Defendant Robert Kramer is a 23-year-old male citizen domiciled in California.

23. Defendant Gregory Lynn Trax is a 22-year-old male citizen domiciled in Florida.

24. Defendant Brenden Tyler Rubio is a 22-year-old-male citizen domiciled in Florida.

## JURISDICTION AND VENUE

25. The amount in controversy here, without interest and costs, exceeds $75,000.

26. Additionally, this case is between citizens of different States.

27. The Defendants are citizens of New York, California, and Florida.

28. Under 28 U.S.C. § 1332(c)(2), Plaintiffs, as the "legal representative[s] of the estate of [Alexander Bello Ortiz]" are "deemed to be a citizen only of the same State as [Ortiz]," which is Virginia.

29. Complete diversity of citizenship exists between Plaintiffs and Defendants under 28 U.S.C. § 1332.

30. Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) as a "substantial part of the events…giving rise to the claim occurred" in Daytona Beach, Florida, located in the Middle District of Florida.

## FACTUAL ALLEGATIONS

### Alex Dreamed of Serving in the Military

31. Alexander Bello Ortiz was raised in Virginia, outside our Nation's capital.

32. As a young boy, Alex expressed interest in the military, even joining the Navy's Sea Cadets when he was only eight years old.

33. In high school, Alex was an Eagle Scout, a state champion member of the crew team, and an AP student who earned Presidential recognition for his achievements.

34. Alex earned a full scholarship to Norwich University in Vermont, as a cadet in the Air Force Reserve Officer Training Course (AFROTC).

35. He studied electrical engineering and planned to work as a NASA engineer.

36. In September 2019, Alex transferred his engineering scholarship from Norwich to Embry Riddle Aeronautical University (ERAU), in Daytona Beach, Florida, to gain access to ERAU's strong engineering program.

37. At ERAU, Alex joined the AFROTC Detachment 157.

38. The same semester of his transfer, Alex was named Wing Commander, a position of leadership among his fellow AFROTC cadets.

39. In April 2020, Alex was named the Morale Officer for Detachment 157 because of his extraordinary performance as a Wing Commander and his motivational leadership.

40. In September 2020, Alex was nominated by his superiors for the Non-Commissioned Officer Award, as Cadet of the Year, for his previous semester's performance.

41. Alex was a shining star, whose brightness was extinguished all too soon.

**Alex Spends his Summer Fixing Up a Home**

42. During the summer of 2020, Alex's parents purchased, as an investment for themselves, a small home in Daytona Beach so that Alex could live off-campus his senior year of college.

43. Alex spent the summer restoring the modest three-bedroom two-bathroom property at 941 Vernon Street in Daytona Beach, Florida.

44. He bought discount lumber and cut each piece by hand to build a white picket fence.

45. He painted the home's interior a color referred to as "Alex" because he mixed it himself from discounted paints at the hardware store.

46. Alex laid each stone in the walkway, by hand, leading up to his porch.

47. An American flag greeted visitors at the front door.

48. 

49. To help offset expenses, Alex placed an ad in an AFROTC publication seeking roommates.

50. In mid-August 2020, two AFROTC cadets moved in with Alex; Robert Kramer, a cadet from California whom Alex had seen at Boot Camp, and John Burlein, a cadet from Titusville, Florida, whom Alex did not know at all.

51. Unfortunately, less than a month after move-in, John Burlein began causing problems.

52. A mere day before the shooting, John told his friends Brenden Rubio and Robert Kramer that John wanted to shoot Alex.

53. Alex, not surprisingly, wanted John to leave.

54. John's animosity and threats towards Alex are captured in audio and video from cameras around the Vernon Street home.

**Tensions Rise on Vernon Street**

55. By early September, tensions between John and Alex had come to a head.

56. Alex expressed concerns about John to his family.

57. Shortly after midnight on Saturday, September 5, 2020, John's friends from high school, Gregory Trax and Brenden Rubio, arrived at Vernon Street to hang out with John.

58. John, and his friends, Greg Trax, Brenden Rubio, and Henry Lax, have been, at times, involved with drugs.

59. Upon information and belief, Alex disapproved of John using drugs and bringing drugs – along with John's drug-using friends – to Alex's home.

60. John's friends, Gregory and Brenden, suggested to John that he should kill Alex.

61. In an argument later that afternoon, apparently prompted by his friends' earlier suggestions, John threatened to kill Alex.

62. Less than 24 hours later, that's exactly what John did.

### Alex's Weekend Plans

63. Meanwhile on September 5th, while not being harassed by his roommates, Alex made plans to spend time with his family.

64. Alex's Jeep had been in the shop, and he arranged with the mechanic for Alex to pick it up the next day, Sunday, September 6th.

65. Alex planned to take his Jeep on the four hour drive down to Miami to visit his step-brother and step-sister, spending Sunday and Monday with family.

66. Tragically, he would never get the chance.

### John Burlein and Henry Lax Steal a Gun to Murder Alex

67. After Alex fell asleep Saturday night, John Burlein and his friend, Henry Lax, arrived at the Vernon Street home, under the cover of darkness.

68. John and Henry were caught on the house's security camera conspiring to break into Alex's room and steal a rifle that Alex had been holding for an acquaintance.

69. John later used this rifle to shoot Alex dead.

70. The next morning, Sunday, September 6th, Alex got up early to surf and go for a run.

71. He had no idea the day would be his last.

72. Back home Alex practiced yoga and Thai Chi, hobbies he used, in part, to calm his nerves.

73. Around 11:43am, Alex's roommate Robert Kramer headed out for a jog.

74. John stayed at home.

75. Within minutes, Alex and John began arguing, which led to a physical confrontation.

76. Alex pleaded to John to get off him.

77. John taunted Alex with a gun.

78. And, immediately thereafter, at 11:56am, on September 6, 2020 John Burlein shot Alex in the head.

**John Burlein Conspires with his Father Joseph Burlein while Alex Lays Dying**

79. Immediately after shooting Alex, John began to cover his tracks.

80. First, John barricaded the front door with the living room sofa.

81. Next, John called, not 911, but his father, retired Air Force Captain, Joseph Burlein.

82. On the phone, John admitted to his father that he shot Alex.

83. Audio recording from the Ring cameras captured the following exchange between John and a second individual who appears to be his father, Joseph, on speaker phone:

> Did you fucking kill him?
>
> **I did.**
> **Fuck**.
>
> What if he's not dead?
>
> **Alex is dead.**

84. John and his father, Joseph, then conspired to contrive a story that Alex took his own life.

85. Alex had no financial trouble, relationship issues, or problems with drugs.

86. He was happy, energetic, and a "beacon of optimism."

87. Alex had positive near- and long-term plans, with no reason or intention to commit suicide.

88. That very afternoon Alex intended to visit his family for the rest of the holiday weekend.

89. During the time that John and Joseph invented a story about Alex's "suicide," Alex lay suffering, barely breathing, in a pool of his own blood.

90. After manipulating the crime scene, staging evidence, and cleaning away his involvement, John finally called 911 at noon, more than **five minutes** after shooting Alex.

91. Following his father's instructions, John lied to the dispatcher, claiming that Alex collapsed at the house.

92. During the eight-minute 911-call, John did not mention that he shot Alex, that he heard a gunshot, or that a gun was involved at all.

93. Meanwhile, Robert Kramer returned from his run but struggled to enter the house because John had barricaded the front door – presumably to buy himself time.

## John Lies to Minimize Police Involvement

94. To 911, John claimed that Alex had been "cleaning" before he suddenly collapsed.

95. To the Daytona Beach Fire Department (DBFD), John claimed that Alex was "spazzing out," and that John had heard a crash after going to eat something.

96. John also told DBFD that he did not hear any gunshot.

97. John continued lying throughout, and beyond, the brief investigation into Alex's death.

98. It was not until EMTs saw a gun next to Alex that they, not John, summoned police.

99. At 12:14pm, Alex left his home for the last time, on a stretcher.

100. The EMTs did not secure Alex's head, which lolled off the side of the gurney and was coldly pushed back on.

101. And it appears that only limited attempts were made to perform CPR.

102. By that time, John's partner in crime from earlier that morning, Henry Lax, had arrived back at Vernon Street.

103. Henry eventually went to the hospital to keep an eye on Alex, and, importantly, relay information to John and Joseph about Alex's condition.

## The Police Investigation

104. The first Daytona Beach Police officer did not arrive at Vernon Street until 12:37pm, more than half an hour after John shot Alex.

105. After EMTs departed and prior to police arriving, John Burlein, Robert Kramer, and Henry Lax had unfettered access to the scene.

106. Apparently due to the effectiveness of the Defendants' cover-up, traditional measures normally taken at a crime scene were not taken in this instance.

107. The crime scene was not cordoned off.

108. Potential suspects were not separated.

109. Formal recorded statements of the witnesses or neighbors were not taken.

110. Potential suspects' hands were not swabbed for gunshot residue

111. Investigators did eventually swab Alex for GSR in the hospital, due to his parents' insistence.

112. The results came back negative, showing that Alex did not shoot a gun.

113. Potential suspects were allowed to handle evidence compromising the integrity of the crime scene.

114. While the gun was eventually collected and five DNA swabs were taken from it, those swabs were not processed or analyzed for the shooter's DNA.

115. Furthermore, the police eventually wrote a narrative, based on John's lies and successful cover-up, that Alex was on mushrooms at the time of his death.

116. This allegation was directly refuted by two toxicology reports, one from the hospital and one from the Medical Examiner's Officer.

117. As an organ donor, Alex's organs also underwent testing prior to being used to save lives and showed no evidence of substance abuse or use.

**Joseph Burlein Covers his Son John's Tracks**

118. The narrative contrived by John and his father, Joseph Burlein, worked to distract the police and minimize their involvement.

119. Joseph arrived at Vernon Street around 2:30pm.

120. Joseph immediately began covering up his son's tracks.

121. Less than 30 minutes after Joseph arrived, and less than three hours after a fatal shooting, the Daytona Beach Police left Vernon Street, having effectively turned over the crime scene to a potential suspect, his friends, and family.

122. Shortly after 3pm, Joseph appears to have disconnected the battery-operated security camera in the front living room.

123. Joseph also phoned individuals whom he believed would have influence over the situation in an attempt to ensure that Alex's death would not be investigated and that John would not be prosecuted.

124. Once police left the scene, Joseph conscripted John Burlein, and Robert Kramer, to help purchase cleaning supplies.

125. Joseph directed the group to use mops, bleach, buckets and trash bags to clean the scene and destroy any remaining evidence.

126. During this time, Joseph continued instructing John and his friends to make sure they keep their stories straight and reminded them of the narrative: Alex killed himself.

127. By 8pm, Joseph and the rest of the group had left Vernon Street, having wiped clean all evidence of John's crime, and all hope of seeking justice for Alex.

128. John's friends helped cover up the crime even though they knew that John had discussed killing Alex and that there was no indication that Alex was unstable.

**Efforts to Seek Justice**

129. The above information has been diligently collected by Alex's parents, in their near solo investigation of their son's death.

130. Meanwhile, Alex's achievements live on, as ERAU awarded Alex his degree, as an Electrical Engineer, posthumously, with *cum laude* honors.

131. One of the most tragic consequences of what happened was to cast shame on a man who was admired and respected by all who knew him. During the short hours that he was in the hospital, over 300 hand-written messages were sent to Alex from his fellow cadets wishing him well and praying for his recovery because he had changed their lives for the better.

132. Necessarily and intentionally, the Defendants inflicted even more horror and emotional distress on Lourdes Ortiz and her family by heartlessly crushing Alex's life and legacy.

133. Alex's life was wrongfully taken from this world, but that does not mean some measure of justice cannot be achieved.

## COUNT I
## INTENTIONAL BATTERY/MURDER CLAIM AGAINST JOHN BURLEIN

Paragraphs 1 through 133, above, are adopted and incorporated by reference here.

134. This claim is brought pursuant to Florida's Wrongful Death Act, Fla. Stat. § 768.16 et seq.

135. On or about September 6, 2020, Defendant John Burlein, planned to, prepared to, and did batter and murder Alexander Bello Ortiz.

136. The battery committed by John Burlein, in the form of shooting Alexander Bello Ortiz, was an unlawful use of force.

137. The battery by shooting was an intentional act or the result of an intentional act that John Burlein committed with the intention of inflicting harmful or offensive contact, or creating the apprehension thereof in Alexander Bello Ortiz.

138. Alexander Bello Ortiz did not consent to the offensive contact.

139. The battery committed by John Burlein resulted in Alexander Bello Ortiz's death, contrary to Fla. Stat. § 782.04, *Murder*.

140. As a direct and proximate result of the Defendant's intentional act, and the wrongful death of Alexander Bello Ortiz, his Estate has incurred damages pursuant to the Florida Wrongful Death Act, including, but not limited to, loss of the prospective net accumulations of an estate, which might reasonably have been expected but for the wrongful death, reduced to present money value, medical expenses and/or funeral expenses that have become a charge against his estate or that were paid by or on behalf of decedent, as well as other damages.

141. As a further direct and proximate result of the Defendant's intentional act, and the wrongful death of Alexander Bello Ortiz, the decedent's mother, Lourdes Ortiz, and other surviving family members, have suffered, and will continue to suffer, damages pursuant to the Florida Wrongful Death Act, including, but not limited to, lost support and services from the date of the decedent's injury to her death, with interest, and future loss of support and services from the date of death and reduced to present value, mental pain and suffering from the date of injury, and medical and funeral expenses.

WHEREFORE, Plaintiffs, Maria Lourdes Ortiz and Harold William Dolph, as Personal Representatives of the Estate of Alexander Bello Ortiz, for and on behalf of the Estate and Survivors thereof, demands judgment against Defendants for damages from the above claims in excess of seventy five thousand dollars ($75,000), exclusive of interest, fees, and costs, for which he prays in addition thereto, along with any other or further relief as this Court deems just and proper, including, but not limited to, available punitive damages for the Defendants' intentional misconduct and/or gross negligence.

## COUNT II
## NEGLIGENCE CLAIM AGAINST JOHN BURLEIN, IN THE ALTERNATIVE

Paragraphs 1 through 133, above, are adopted and incorporated by reference here.

142. This claim is brought pursuant to Florida's Wrongful Death Act, Fla. Stat. § 768.16 et seq.

143. On or about September 6, 2020, Defendant John Burlein owed a duty of care to the public in general and to the decedent, Alexander Bello Ortiz, to live in a safe and reasonable manner so as not to cause harm to any member of the public, including the decedent.

144. On or about September 6, 2020, Defendant John Burlein breached this duty of care when he negligently handled a firearm that resulted in the discharge and shooting of Alexander Bello Ortiz.

145. As a direct and proximate result of Defendant John Burlein's negligence, the above incident occurred, and Alexander Bello Ortiz suffered injuries resulting in his untimely death.

146. As a direct and proximate result of the Defendant's negligent act, and the wrongful death of Alexander Bello Ortiz, his Estate has incurred damages pursuant to the Florida Wrongful Death Act, including, but not limited to, loss of the prospective net accumulations of an estate, which might reasonably have been expected but for the wrongful death, reduced to present money value, medical expenses and/or funeral expenses that have become a charge against his estate or that were paid by or on behalf of decedent, as well as other damages.

147. As a further direct and proximate result of the Defendant's intentional act, and the wrongful death of Alexander Bello Ortiz, the decedent's mother, Lourdes Ortiz, and other surviving family members, have suffered, and will continue to suffer, damages pursuant to the Florida Wrongful Death Act, including, but not limited to, lost support and services from the date of the decedent's injury to her death, with interest, and future loss of support and services from the date of death and reduced to present value, mental pain and suffering from the date of injury, and medical and funeral expenses.

WHEREFORE, Plaintiffs, Maria Lourdes Ortiz and Harold William Dolph, as Personal Representatives of the Estate of Alexander Bello Ortiz, for and on behalf of the Estate and Survivors thereof, demands judgment against Defendants for damages from the above claims in excess of seventy five thousand dollars ($75,000), exclusive of interest, fees, and costs, for which he prays in addition thereto, along with any other or further relief as this Court deems just and proper, including, but not limited to, available punitive damages for the Defendants' intentional misconduct and/or gross negligence.

### COUNT III
### CIVIL CONSPIRACY AGAINST DEFENDANTS JOHN BURLEIN, JOSEPH BURLEIN, GREG TRAX, BRENDEN RUBIO, HENRY LAX, AND ROBERT KRAMER

Paragraphs 1 through 133, above, are adopted and incorporated by reference here.

148. This claim is brought pursuant to Florida's Wrongful Death Act, Fla. Stat. § 768.16 et seq.

149. On or about September 5 and 6, 2020, Defendant John Burlein conspired with Defendants Henry Lax, Brenden Rubio, Gregory Trax, Robert Kramer, and Joseph Burlein to conceal the true nature of how Alexander Bellow Ortiz was killed, cover up the crime, and intentionally inflict emotional distress on the decedent, Alexander Bello Ortiz, as well as his surviving family members.

150. The above-named Defendants agreed to commit unlawful acts, and did commit unlawful acts, in furtherance of this conspiracy.

151. The Defendants agreed to cover up the crime, clean the crime scene, and dispose of any evidence.

152. Specifically, as to Greg Trax, his agreement to join the conspiracy began on or about September 5, 2020, following the early morning argument between John and Alex, initially

when Trax told John Burlein, "Maybe you'll wanna find yourself another hitman," referring to Alex Bello Ortiz and agreeing to assist in his elimination the day before Burlein shot Alex dead.

153. Specifically, as to Brenden Rubio, his agreement to join the conspiracy began on or about September 5, 2020, following the early morning argument between John and Alex, initially when Rubio was present for Trax's prompting of Burlein to get a hitman, and continuing when Rubio agreed to encourage this violence by urging John to "Hit him in the brain bitch."

154. Specifically, as to Henry Lax, his agreement to join the conspiracy began on or about September 6, 2020, initially when Lax agreed to assist Burlein in acquiring the murder weapon by breaking into Alex's bedroom to steal the firearm that Burlein used later that same day to shoot Alex dead.

155. Specifically, as to Robert Kramer, he knew that John wanted to shoot Alex and helped clean up the crime scene after Alex's death.

156. Specifically, as to Joseph Burlein, his agreement to join the conspiracy began on or about September 6, 2020, initially when Joseph Burlein collaborated with his son John to manipulate the scene of Alex's shooting and concoct a false narrative to tell first responders, while Alex was still alive, so that Alex did not receive timely or appropriately urgent medical care that led to his eventual death and protected John from the only eyewitness account of John's crimes.

157. John Burlein staged the crime scene, gave inconsistent statements to the police, and purchased cleaning supplies and, at Joseph's direction, used mops, bleach, buckets and trash bags to clean the scene and destroy any remaining evidence.

158. As a direct and proximate result of the Defendants' conspiracy, and the wrongful death of Alexander Bello Ortiz, Ortiz's Estate has incurred damages pursuant to the Florida Wrongful Death Act, including, but not limited to, loss of the prospective net accumulations of an

estate, which might reasonably have been expected but for the wrongful death, reduced to present money value, medical expenses and/or funeral expenses that have become a charge against his estate or that were paid by or on behalf of decedent, as well as other damages.

159.   As a further direct and proximate result of the Defendants' conspiracy, and the wrongful death of Alexander Bello Ortiz, the decedent's mother, Lourdes Ortiz, and other surviving family members, have suffered, and will continue to suffer, damages pursuant to the Florida Wrongful Death Act, including, but not limited to, lost support and services from the date of the decedent's injury to her death, with interest, and future loss of support and services from the date of death and reduced to present value, mental pain and suffering from the date of injury, and medical and funeral expenses.

WHEREFORE, Plaintiffs, Maria Lourdes Ortiz and Harold William Dolph, as Personal Representatives of the Estate of Alexander Bello Ortiz, for and on behalf of the Estate and Survivors thereof, demands judgment against Defendants for damages from the above claims in excess of seventy five thousand dollars ($75,000), exclusive of interest, fees, and costs, for which he prays in addition thereto, along with any other or further relief as this Court deems just and proper, including, but not limited to, available punitive damages for the Defendants' intentional misconduct and/or gross negligence.

### COUNT IV
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AGAINST
### JOHN BURLEIN AND JOSEPH BURLEIN

Paragraphs 1 through 133, above, are adopted and incorporated by reference here.

160.   This claim is brought pursuant to Florida's Wrongful Death Act, Fla. Stat. § 768.16 et seq.

161. On or about September 5 and 6, 2020, Defendants John Burlein and Joseph Burlein, intentionally inflicted emotional distress on the decedent, Alexander Bello Ortiz, as well as his surviving family members.

162. Above named Defendants engaged in intentional and reckless behavior they knew or should have known would cause emotional distress to Alexander Bello Ortiz and his surviving family.

163. The Defendants' behavior was so outrageous as to go beyond all bounds of decency, and should be regarded as odious and utterly intolerable in a civilized community.

164. Specifically, the Defendants engaged in an agreement to tamper with evidence to make the intentional or negligent shooting appear as though it were a "suicide."

165. The Defendants covered up a crime scene by bleaching away evidence that John Burlein shot and killed Alexander Bello Ortiz.

166. Additionally, the Defendants collaborated to produce and disseminate the false narrative that Ortiz committed suicide.

167. The Defendants' conduct caused emotional distress, and the emotional distress was severe both to Ortiz – who was living and listening while John and Joseph Burlein hatched this egregious plan – and to Ortiz's survivors, who have been especially devastated by this gross mischaracterization of Ortiz's death.

168. As a direct and proximate result of the Defendants' Intentional Infliction of Emotional Distress, and the wrongful death of Alexander Bello Ortiz, the decedent's Estate, his mother, Lourdes Ortiz, and other surviving family members, have suffered, and will continue to suffer damages.

WHEREFORE, Plaintiffs, Maria Lourdes Ortiz and Harold William Dolph, as Personal Representatives of the Estate of Alexander Bello Ortiz, for and on behalf of the Estate and Survivors thereof, demands judgment against Defendants for damages from the above claims in excess of seventy five thousand dollars ($75,000), exclusive of interest, fees, and costs, for which he prays in addition thereto, along with any other or further relief as this Court deems just and proper, including, but not limited to, available punitive damages for the Defendants' intentional misconduct and/or gross negligence.

## DEMAND FOR JURY TRIAL

Plaintiffs, Maria Lourdes Ortiz and Harold William Dolph, as Personal Representatives and Co-Administrators of the Estate of Alexander Ovidio Bello Ortiz, hereby demand a trial by jury of all issues so triable by right.

Dated: September 6, 2022.

Respectfully submitted,

**COFFEY BURLINGTON, P.L.**
*Counsel for Plaintiffs*
2601 S. Bayshore Drive, PH-1
Miami, Florida 33133
Tel: (305) 858-2900
Fax: (305) 858-5261

By: */s/ David J. Zack*
**David J. Zack, Esq.**
Florida Bar No. 641685
**Kendall Coffey, Esq.**
Florida Bar No. 259861
**Adam Saper, Esq.**
Florida Bar No. 11750
kcoffey@coffeyburlington.com
asaper@coffeyburlington.com
lmaltz@coffeyburlington.com
service@coffeyburlington.com